[Civ. No. 12740.  First Dist., Div. One.  Feb. 1, 1945.]

D. J. ARQUES, Respondent, v. THE NATIONAL SUPE-
RIOR COMPANY (a Corporation) et al., Appellants.

William B. Acton for Appellants.

Erwin C. Easton and George Olshausen for Respondent.

WARD, J.—This appeal is from a judgment for plaintiff in an action for the conversion of the vessel "St. Mary." The historical background is set forth in *Balestreiri v. Arques,* 49 Cal.App.2d 664, 665-666-667 [122 P.2d 277], an action for declaratory relief, in which Balestreiri was named as plaintiff and respondent, and Arques as defendant and appellant. We quote the facts from the opinion in that case:

"The vessel in question was originally a towboat which belonged to one Coughlin and was named the 'Oregon.' In

1933, she ran upon a submerged pile in the Oakland Estuary and stove a hole in her bottom. She was patched and towed to the mud flats in Richardson Bay where she lay for some time. In 1934 she was taken to the shipyard of defendant in Sausalito and was repaired. The repairs were completed and a bill was presented but Coughlin was unable to make payment. Some time passed and in the spring of 1935, Coughlin and defendant agreed that the vessel should be sold. Plaintiff learned that the vessel was for sale and he inspected it with the thought that it might be converted into a purse seiner. Discussions took place between plaintiff, defendant, Coughlin and others at defendant's shipyard. Defendant represented that the vessel could be made into a purse seiner and Coughlin told plaintiff that if plaintiff could finance the necessary work he would transfer to plaintiff a half interest in the vessel. Plaintiff brought a representative of a marine engine company to the shipyard. Further discussions were had and said representative recommended that an engine costing about $18,000 should be installed. During said discussions, neither defendant nor Coughlin made any mention of the repairs which had been made by defendant for Coughlin in 1934 below the water line of said vessel. At one point in the discussions plaintiff asked Coughlin and defendant if Coughlin owed any money on the boat and Coughlin answered 'that he didn't owe a dime on the boat—there was no lien.' Defendant made no reply. Thereafter plaintiff entered into an agreement with Coughlin and the latter transferred to plaintiff a half interest in the boat with the knowledge of defendant.

"In June, 1935, plaintiff, defendant and Coughlin met at the shipyard and a written agreement was entered into by the three men by which defendant agreed to do certain work on the hull of the boat for $4,300, of which $1,000 was to be paid on the execution of the agreement, $1,000 on July 1, and the balance was to be paid by notes over a period of time. The work was to be completed within thirty days after delivery of the engine. The engine was delivered on August 16. The two $1,000 payments were made as agreed. While the work was progressing plaintiff and Coughlin incorporated the Sardine Fishing Company and transferred the vessel to said corporation.

"On September 20, 1935, and after the time agreed upon for the completion of the work had expired, a dispute arose

when defendant made a claim for certain alleged 'extras.' The agreed work had not then been fully completed. Plaintiff was advised that the vessel could not leave the shipyard and that defendant would not complete the agreed work until the bill for extras had been approved. Plaintiff had arranged for other work to be done on the boat in San Francisco and was anxious to get all work completed as the fishing season had begun on August 15. Plaintiff offered to arbitrate the matter and to put up a bond to protect defendant against any valid claim but plaintiff refused to approve the bill for the alleged extras.

"On September 23, 1935, plaintiff advised defendant that he was coming over to take the vessel to San Francisco on the afternoon high tide. A heated discussion followed plaintiff's arrival at the shipyard, but plaintiff finally took the boat during defendant's temporary absence. Thereupon defendant's counsel filed a libel in admiralty covering all claims for the 1935 repairs. Plaintiff filed a bond for the release of the vessel and at the time of the approval thereof, mention was first made to plaintiff of an alleged claim for 1934 repairs.

"Defendant then caused the arrest of plaintiff on a charge of grand theft upon the theory that plaintiff had wrongfully taken the vessel from the possession of defendant in violation of defendant's alleged possessory lien. (*People* v. *Cain,* 7 Cal.App. 163 [93 P. 1037].) Plaintiff was held to answer and was subsequently tried by a jury in the Superior Court of Marin County. The jury found him guilty but recommended leniency. The trial court granted probation upon condition that plaintiff give a bond securing defendant 'against any detriment or loss for or on account of any valid claim of possessory lien which Donlon J. Arques may have had for money due him on the day the ''St. Mary'' was taken from his possession, for work done or materials furnished said vessel.' ''

In the above case the court said that it was "unnecessary to discuss plaintiff's contention that no possessory lien could have resulted from the making of repairs to the vessel under the circumstances"; that it appeared that Arques was by his conduct estopped to assert a lien based upon repairs made and materials furnished in 1934; that there was a failure to assert such claim of possessory lien. Other facts than those set forth above will be given as the points in the present appeal require.

Relative to the first claim for repairs the trial court herein, as in the previous case, held that Arques was "estopped to assert or claim such prior lien (if any)." The purpose of the present action is not to enforce a possessory lien but to recover damages for its breach. The present case involves the balance due on the 1935 contract and for extras. This issue requires a determination of the major question: Did plaintiff have the right to hold the property until reasonable charges for alteration and repair had been paid? Harbors and Navigation Code, section 490, based upon former Civil Code section 3060, provides that "Debts amounting to at least fifty dollars, contracted for the benefit of vessels, are liens in the cases provided in section 491." Section 491, similar to section 813, Code of Civil Procedure, with the exception of a few words which do not affect the applicability of the section to this case, provides: "All vessels are liable for: (a) Services rendered on board at the request of, or under contract with, their respective owners, masters, agents, or consignees. (b) Supplies furnished in this State for their use, at the request of their respective owners, masters, agents, or consignees. (c) Work done or materials furnished in this State for their construction, repair, or equipment. . . . Demands for these several causes constitute liens upon all vessels, have priority in the order enumerated, and have preference over all other demands; but such liens only continue in force for the period of one year from the time the cause of action accrued." Civil Code, section 3051, provides in part: "Every person who, while lawfully in possession of an article of personal property renders any service to the owner thereof, by labor or skill, employed for the protection, improvement, safekeeping, or carriage thereof, has a special lien thereon, dependent on possession, for the compensation, if any, which is due to him from the owner for such service." ■ Except in instances of conflict between titles (Pol. Code, § 4481) or chapters (Pol. Code, §4482), the provisions of the codes must, as far as may reasonably be possible, be construed as though parts of the same statute (Pol. Code, §4480). (*Weber* v. *McCleverty*, 149 Cal. 316 [86 P. 706].) "There is a well-recognized rule of statutory construction that the codes blend into each other, and are to be regarded as constituting but a single statute." (*Proctor* v. *Justice's Court*, 209 Cal. 39, 43 [285 P. 312].)

■ If property is wrongfully taken from one having a valuable interest therein arising from services rendered (Civ.

Code, §3051); and such party has a statutory right of possession in the nature of a lien, he may maintain an action in trover against the legal owner for damages sustained by reason of the conversion and demand reasonable compensation for labor or materials furnished. (16 Cal.Jur., p. 361, §59.)

■ The value of or agreed price for the work or materials, if contracted for the benefit of a vessel (Harb. & Nav. Code, §490), constitutes a lien upon the vessel, with priority in the order enumerated in Harbors and Navigation Code, section 491.

■ Appellants contend that respondent did not have a possessory lien but only the usual maritime lien, enforceable in admiralty. It may be admitted that Civil Code, section 3051, does not specifically refer to floating vessels. Former Civil Code, sections 3055, 3056 and 3060, have been superseded by Harbors and Navigation Code, sections 492, 493 and 490 respectively. It is also contended that the act of Congress of 1910 (46 U.S.C.A. §971) completely established the federal maritime lien, making it independent of possession. The Ship Lien Act referred to contains a provision that a maritime lien for furnishing repairs, supplies or other necessities to any vessel upon the order of an owner or his representative may be enforced by a suit in rem. (46 U.S.C.A. §971.)

The Judicature Act of 1789 (28 U.S.C.A. §371, 1 Stat. at L. 76, ch. 20), giving the United States courts jurisdiction in admiralty liens may be said to work hand in hand with state courts if jurisdiction may be obtained in the latter courts. The original act provides in section 9 "saving to suitors, in all cases, the right of a common-law remedy, where the common law is competent to give it."

". . . every structure adapted to be navigated from place to place for the transportation of merchandise or persons" is a vessel. (Harb. & Nav. Code, § 21; Pol. Code, § 17.)

In *Olsen* v. *W. H. Birch & Co.*, 133 Cal. 479 [65 P. 1032, 85 Am.St.Rep. 215], a case involving a vessel which had never been in commission or in active use in navigation, it was indicated that a vessel temporarily laid up for repairs is still considered engaged in commerce. In the present case the vessel had not been temporarily laid up but had been taken out of service as a towboat and towed to mud flats. She was subsequently taken to plaintiff's shipyard and converted into a purse seiner. In that capacity she had never been in commission; had never been ready for safe navigation; had not

had her trial trip, and consequently was not used at the time of seizure by Balestreiri in the trade and commerce of sardine fishing in the customary way by operating nets. In the Olsen action, brought to foreclose liens upon a vessel constructed in San Francisco, the following points were raised (p. 481): "1. That the law is invalid, as in conflict with section 2 of article III of the constitution of the United States, which declares that the jurisdiction of the Federal courts shall extend to all cases of admiralty and maritime jurisdiction; and 2. That jurisdiction of the state courts is forbidden by section 711 of the Revised Statutes of the United States. This statute declares that 'the jurisdiction of the Federal courts of cases of admiralty and maritime jurisdiction is exclusive, saving to suitors in all cases the rights of a common-law remedy where the common law is competent to give it.'" The opinion, written with facility of expression by Mr. Justice Temple, evidences such knowledge of the problem involved and the history of legislation thereon that we feel justified in quoting from it at length (pp. 481-482, 483-484): "The statutes here called in question are certain sections of the Code of Civil Procedure. (Secs. 813 et seq.) The matter is the more interesting because (as is well known to the writer of this opinion) these sections were carefully revised by the late Stephen J. Field after and in view of the decisions in *The Moses Taylor*, 4 Wall. [411] 431 [18 L.Ed. 397], and *The Hine* v. *Trevor*, 4 Wall. [555] 571 [18 L.Ed. 451]; and in the report of the so-called code revisers, which was written by Judge Field, the claim was made, that for the first time these sections had been made valid. But I think we need not enter very fully into this discussion. The code provisions are certainly not invalid, although a suit might be brought under them of which the courts of the state would have no jurisdiction. If the claim sued upon was one arising from a maritime contract, and the owners were unknown, or if the owner could not be found, and the summons was only served upon the master, mate, or other person in charge of the vessel, a serious question would be presented. But here the owner has appeared and answered, and the action is against him by name, and the claim asserted did not arise upon a maritime contract. And it may be added, the suit is not a proceeding *in rem*. And, of course, the statute giving the right to a lien

would be perfectly valid, although no action could be brought under it in the state courts.

". . . Maritime contracts have reference to navigation upon the sea, and in some way to vessels actually being used in commerce, or at least in navigation. . . .

"Evidently there is here a misapprehension as to the basis of admiralty jurisdiction. It does not extend to ships, merely because they are ships, but to commerce and navigation, and to ships only because they are, and while they are, used in commerce and navigation. A ship while building is not an instrument of commerce, nor is she while out of commission, and being cared for to preserve her for possible future use. . . .

"But this suit is not a proceeding *in rem*. Had the contract been maritime, a proceeding *in rem* could have been had in the district court; nevertheless, if a common-law remedy could have been made available, such remedy could have been afforded by the state court. Here the action is against the owner, and such owner has appeared and answered. The vessel was not seized, and there was actual service of summons. The main difference between an action *in rem* and an action *in personam* is indicated by the two phrases. One is against the thing as the defendant, and the judgment is that the thing is indebted; and, furthermore, the *res* is taken possession of and held by the court, and its jurisdiction depends upon such possession and holding. Here, the judgment is against the owner, and the sale of the property, if one is had, will be like an ordinary sale under execution.

"Such proceedings are said to be *quasi in rem*, which phrase has become quite common since *Pennoyer* v. *Neff*, 95 U.S. 714 [24 L.Ed. 565]. It is there said that such proceedings are not strictly *in rem*, because they are not against the thing as debtor. The subject is discussed in Waples on Proceedings in Rem (c. 56). And the right to maintain such suits in the state courts has been upheld by the supreme court of the United States. (*Leon* v. *Galceran*, 11 Wall. 185 [20 L.Ed. 74]; *Johnson* v. *Chicago Elevator Co.*, 119 U.S. 388 [7 S.Ct. 254, 30 L.Ed. 447]; *The Glide*, 167 U.S. 606 [17 S.Ct. 930, 42 L.Ed. 296].)"

The conclusions in the Olsen case are to some extent based upon *William* v. *The Sirius*, 65 F. 226. The Sirius, a British vessel, had been engaged in commerce but was sold in San Francisco. It was not enrolled as an American vessel, however, and was not in commission. The court held that the

employing of a watchman did not constitute a maritime contract.

In *Knapp, Stout & Co.* v. *McCaffrey,* 177 U.S. 638 [20 S.Ct. 824, 44 L.Ed. 921], it was held that a bill in equity to foreclose a common law lien upon a raft for towage services is not an invasion of admiralty jurisdiction, but is a proceeding to enforce a common law remedy and within the saving clause of the Judicature Act. It was also held that the action was in personam and not in rem.

Whether a contract for work on a vessel is a contract for construction, reconstruction or merely repair is a question dependent upon a number of factors. In the present case the work on part of the vessel—the installation of an engine— had proceeded to the extent that the vessel was nearly ready for a series of tests. As we will subsequently see, California has held that a shipwright has the legal right of retaining. possession of a vessel for "repair" work. (*United States of Mexico* v. *Rask,* 118 Cal.App. 21 [4 P.2d 981].)

The towboat herein, the "Oregon" had ceased to be navigable as a commissioned ship. The necessary operation to change it into a purse seiner required more than slight repair. The change was not only in identity of name but of kind of vessel. The claim did not arise from a maritime contract. The purse seiner St. Mary had never been in commission; it had never been navigated or been engaged in commerce in its intended sphere of activity. The vessel was not seized. The alleged owner has appeared and answered and the judgment is against him and others. It is true that in some cases in which appeared one or two of the basic facts present in this case, it was held that, under certain circumstances, the jurisdiction in lien questions rests with the federal courts. (*In re Burton S.S. Co.,* 3 F.2d 1015; *The Portland,* 273 F. 401; *New Bedford Dry Dock Co.* v. *Purdy, Claimant of the Steamer "Jack-O-Lantern,"* 258 U.S. 96 [42 S.Ct. 243, 66 L.Ed. 482]; *The George W. Elder,* 196 F. 137; *Piedmont etc. Coal Co.* v. *Seaboard Fisheries Co.,* 254 U.S. 1 [41 S.Ct. 1, 65 L.Ed. 97].) The main contention on this phase of the appeal is that the right to enforce any maritime lien under state law was superseded by the provisions of the Ship Lien Act of 1910. (46 U.S.C.A. § 971.) Prior to 1910 some confusion existed in matters affecting maritime liens dealt with under that act. It has been held that it superseded state

statutes making a difference between home and foreign ports (*In re Burton S.S. Co., supra*) and eliminated an artificial distinction between repairs and supplies. (*Dampskibsselskabet* v. *Signal Oil & Gas Co.*, 310 U.S. 268 [60 S.Ct. 937, 84 L.Ed. 1197].) Its purpose was not to destroy the common law lien but rather clarification by simplifying and unifying maritime liens. It did not repeal the Judicature Act of 1789 directly or impliedly insofar as it relates to the common law remedy of a possessory lien. No authority has been called to our attention holding that the common law remedy is not available in the state courts.

That Civil Code section 3051 is applicable to ships was definitely decided in this state over twenty years subsequent to the passage of the 1910 act. ██ Concurrent remedies do not necessarily conflict but a recovery under one is generally a bar to resort to the other. Since the maritime lien was dismissed, we are not confronted in this case with a concurrent remedy.

██ In the *United States of Mexico* v. *Rask, supra,* an independent nation was the owner of a patrol boat, the "Tecate," which was operated for the protection and enforcement of customs and revenue laws. The Tecate was delivered by a duly authorized agent to respondent Rask to be overhauled and repaired. After the work had been completed, a controversy relative to a balance due for labor and materials furnished by Rask resulted in a claim and delivery action by the United States of Mexico. The Sheriff of San Diego County, upon the giving of a bond, turned the boat over to the agents of Mexico. The major question in that case was whether the California court had any jurisdiction over liens of the nature there involved. After holding that the foreign government had waived its sovereign immunity and, upon the issues presented by its pleadings, impliedly consented to the jurisdiction of the state court, the Rask case decided that the judicial power of the federal government extended to all kinds of cases of maritime and admiralty jurisdiction "to the exclusion of the state courts in actions strictly ·in rem" (p. 41), but the rule does not cover jurisdiction of state courts not strictly in rem "involving liens upon vessels where such lien existed under the common law" (p. 41) which lien was dependent upon possession (p. 42). The Rask case after a discussion of the Judicature Act of 1789 and a review of numerous citations determined (p. 47) that "it therefore

conclusively appears that a common-law lien existed in favor of a shipwright who furnished labor and materials used in the repair of a vessel, which lien was dependent upon his possession of the ship. By section 3051 of the Civil Code this common-law lien has been written into the statute law of California. It therefore follows that the courts of California have jurisdiction in this case'' and that (p. 49) "As a lien at common law existed in favor of a shipwright furnishing materials and labor used in the repair of a vessel dependent upon its possession, the state courts have jurisdiction in this case.

''The common-law lien being written into the statute law of California, respondent had a right to retain the possession of the patrol boat until it was released by payment or by judicial process and the giving of a bond as provided by law.

''The provisions of section 813 et seq. of the Code of Civil Procedure do not provide an exclusive remedy which respondent must follow in this case.''

The Rask case held that the Knapp case was still the law to be followed. Appellants urge that a different conclusion would have been reached had the Knapp case been decided after the passage of the 1910 act. It is also contended that in the Rask case the court held that no maritime lien was involved therein, and that what was there said with reference to section 3051 was dicta. A careful reading of the case indicates that nothing said therein upon the subject here involved was irrelevant to the questions presented. On the contrary those questions required a decision on whether a common law lien existed in favor of the shipwright. The case holds that, where the law of the state confers such lien, a shipwright has a common law lien, dependent upon possession. It is then held that ships may be personal property. (Civ. Code, § 3051; 23 Cal.Jur. 360, § 9.) This holding is not subject to the criticism that it is obiter dictum. The quotations herein from the case sufficiently answer appellants' charge in that respect. Further, even if the quoted portions of the Rask case could be properly characterized as dicta, we are convinced that they embody correct principles of law.

If appellant be correct—that a different conclusion would have been reached in the Knapp case had it been decided after the 1910 act—then it would have been necessary in the Rask case to hold that the 1910 act impliedly repealed the 1789 act relative to the common law remedy of a possessory lien. The latter case was decided some twenty years or more after

the passage of the 1910 act, and was based in part upon federal decisions, including *The City of Miami,* 265 F. 427, in which case the court said (p. 428): "I do not think that the Act of June 23, 1910, c. 373, sec. 5 (36 Stat. 604; U.S.Comp. St. sec. 7787), which repeals only such state statutes as 'purport to create rights of action to be enforced by proceedings in rem against vessels,' affects the Massachusetts statute. The latter confers a possessory lien, something essentially different." In *Red Cross Line* v. *Atlantic Fruit Co.,* 264 U.S. 109, 123-124 [44 S.Ct. 274, 68 L.Ed. 582], the court said: "By reason of the saving clause, state courts have jurisdiction *in personam,* concurrent with the admiralty courts, of all causes of action maritime in their nature arising under charter parties. Judiciary Act of September 24, 1789, c. 20, sec. 9, 1 Stat. 73, 77; Judicial Code, sec. 24, par. 3; *Leon* v. *Galceran,* 11 Wall. 185 [20 L.Ed. 74]; *Schoonmaker* v. *Gilmore,* 102 U.S. 118 [26 L.Ed. 95]; *Chappell* v. *Bradshaw,* 128 U.S. 132 [9 S.Ct. 40, 32 L.Ed. 369]; *De Lovio* v. *Boit,* 2 Gall. 398, 475 [F.Cas. No. 3,776]. The 'right of a common law remedy', so saved to suiters, does not, as has been held in cases which presently will be mentioned, include attempted changes by the States in the substantive admiralty law, but it does include all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved. It includes remedies *in pais,* as well as proceedings in court; judicial remedies conferred by statute, as well as those existing at the common law; remedies in equity, as well as those enforceable in a court of law. *Knapp, Stout & Co.* v. *McCaffrey,* 177 U.S. 638, 644, et seq. [20 S.Ct. 824, 44 L.Ed. 921]; *Rounds* v. *Cloverport Foundry & Machine Co.,* 237 U.S. 303 [35 S.Ct. 596, 59 L.Ed. 966]. A State may not provide a remedy *in rem* for any cause of action within the admiralty jurisdiction. *The Hine* v. *Trevor,* 4 Wall. 555 [18 L.Ed. 451]; *The Glide,* 167 U.S. 606 [17 S.Ct. 930, 42 L.Ed. 296]. But otherwise, the State, having concurrent jurisdiction, is free to adopt such remedies, and to attach to them such incidents, as it sees fit."

Respondent herein held a possessory lien upon the vessel and when, without warrant of law, the vessel was taken from his possession without his consent a cause of action for conversion arose against those who were responsible for the removal of the vessel. This conclusion suggests for considera-

tion the next subject, namely, is the evidence sufficient to support the findings against defendants Meyer, The National Superior Company and The National Supply Company?

It is admitted that Meyer, as the representative of the corporate defendants in superintending the installation of the engine, informed Balestreiri that certain asbestos work should be performed in San Francisco. The purpose in taking the boat from Arques' place to San Francisco was to perform that work, which could have been performed at the Arques' yard. Meyer informed the Chief of Police that he had no right to interfere with Balestreiri; that he was exceeding his authority. Arques instructed Meyer "to leave the boat there." Arques testified: "And I told him that I was the operator of the yard, I had nothing to do with that job, but as the owner of the shipyard that the California lien had to prevail and without the lien we were sunk—— any shipyard is sunk if we didn't have it. He said he didn't care anything about the California lien; I remember that very well; that the California lien meant nothing at all. I said, 'It means everything to me.'. . . Q. Did Meyer go back to the boat? A. He went back to the boat as soon as Mr. Balestreiri threw off the stern line. You see there was a strong flood tide running at the time that boat was taken. . . . Mr. Meyer had the control—the engine control—and took the wheel. . . .Q. State whether or not you saw Mr. Meyer when he went up to the bridge. A. He went up immediately." There is evidence from which an inference may be drawn that Meyer was in charge of the vessel during its trip to San Francisco.

It is suggested by appellants that there is no evidence to substantiate the finding that they converted the vessel "to their own use." They took the vessel for no other persons' use except their own. The installation of asbestos was for their benefit.

It is also claimed that there is no evidence to support the finding of violence. To the question: "Now there was no act of violence committed by Mr. Meyer that afternoon, was there?" Arques testified: "I consider it violence when he says he is going to take a thing forcibly just the same as if he is going to take my purse. I call that violence. The fact he intends to take it out of my place is violence, and it leads to violence and it can't be anything else but tragedy, and that is avoided just by a hairline. The minute that boat is moved, that is violence. When they threatened, that is violence, just

the same as if they carried it out, according to my way of thinking. . . .[I]f a man says he is going to take something that belongs to you, that is violence, because it can't lead to anything else but violence.''

There is evidence to show concerted action between Balestreiri and Meyer in obtaining the vessel against the will and consent of Arques, and of cooperation in sailing it away from the place so Arques could not claim physical possession. Whether this court would have made findings including Meyer as a party to the conversation is not the question to determine. On appeal, findings will not be disturbed if they are supported by evidence from which inferences reasonably upholding them may be deducible. In such instances the conclusion of the trial court is as binding as where a conflict arises from direct evidence. ''This court has frequently held that even though all the facts are admitted or uncontradicted, nevertheless, if it appears that either one of two inferences may fairly and reasonably be deduced from those facts, there still remains in the case a question of fact to be determined by the jury (or by the trial judge where the case is tried without a jury), and that the verdict of the jury or the finding of the trial judge thereon cannot be set aside by this court on the ground that it is not sustained by the evidence (*Anderson* v. *Los Angeles Transfer Co.,* 170 Cal. 66 [148 P. 212]). In so far as the evidence is subject to opposing inferences, it must upon a review thereof be regarded in the light most favorable to the support of the judgment (*Woodard* v. *Glenwood Lumber Co.,* 171 Cal. 513, 519, 520 [153 P. 951]; *Hassell* v. *Bunge,* 167 Cal. 365, 367 [139 P. 800]). 'In reviewing a question of this kind, all the inferences reasonably possible from the evidence favorable to the plaintiff (the prevailing party) must be indulged by this court.' (*Bandle* v. *Commercial Bank of Los Angeles,* 178 Cal. 546, 547 [174 P. 44, 45].)'' (*Mah See* v. *North American Acc. Ins. Co.,* 190 Cal. 421, 426 [213 P. 42, 26 A.L.R. 123].) (See, also, *Webster* v. *Board of Dental Examiners,* 17 Cal.2d 534 [110 P.2d 992]; *Juchert* v. *California Water Service Co.,* 16 Cal.2d 500 [106 P.2d 886]; *Matsuda* v. *Luond,* 52 Cal.App.2d 453 [126 P.2d 359].)

The complaint alleges damages in the sum of $25,000. In an action for conversion, damages are limited to the amount secured by the lien plus compensation for loss of time and expenses incurred. The lien, eliminating the original Coughlin contract (*Balestreiri* v. *Arques, supra*), secured two sep-

arate amounts—that due under the contract and the bill for extras.

The contract balance was $2,300. A small amount had been paid thereon and applied to interest. The aggregate amount due for extras was $3,503.79, making a total of approximately $5,803.79. The work was completed under the direction of another shipwright at a cost to defendants of approximately $1,400. Judgment was entered in the sum of $4,500.

Appellants first contend that there is no legal evidence or proof of the sum of $4,500 awarded Arques by the trial court in that there is no proper foundation laid for admitting in evidence a book referred to as a composition; that it is not a book of original entries and that the accounts appearing in the book were not made contemporaneously with each transaction. Supporting these contentions there are some decisions rendered prior to the adoption of the Uniform Business Records as Evidence Act. (Stats. 1941, ch. 482, p. 1788.) Arques, who participated in the work as superintendent or mechanic, was familiar with wage hire and prices of materials. He testified to the aggregate amount due and referred to the "composition book" containing entries made by him or under his direction. Hours worked, materials used and the cost thereof were written "day by day, or if I skipped a day, I wrote it the next day." This is not the best method of bookkeeping but no item has been called to our attention that suggests a definite inaccuracy. Code of Civil Procedure, section 1953f, provides: "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." As was said in *Loper* v. *Morrison*, 23 Cal. 2d 600, 608 [145 P.2d 1]: "The purpose of this act is to enlarge the operation of the business records exception to the hearsay evidence rule. The common law exception is based on the assumption that records kept in the general course of business usually are accurate, and may be used, in case of necessity, as evidence of the matter recorded"; and in *People* v. *Caldwell*, 55 Cal.App.2d 238, 254 [130 P.2d 495], "In the case of the conduct of the business and affairs of an establishment, it is presumed that the regular course of business of

such establishment is followed (Code Civ. Proc., § 1963, subd. 20) and that the books and records of an establishment truly reflect the facts set forth in such books (Code Civ. Proc., § 1953f).'' (See, also, *People* v. *Jones,* 61 Cal.App.2d 608 [143 P.2d 726]; *Doyle* v. *Chief Oil Co.,* 64 Cal.App.2d 284 [148 P.2d 915].)

The findings and conclusions of law in this case are dated November 30, 1943, and the judgment December 3rd of the same year, although the complaint was filed prior to the adoption of the Uniform Business Records as Evidence Act. The application of the act to the facts herein is constitutionally appropriate. Legislation designed solely as procedural is not subject to the general rule that statutes should not be retroactive. ''The retrospective application of a statute may be unconstitutional if it is *ex post facto,* that is, applying to criminal matters; or if it deprives a person of a vested right; or if it impairs the obligation of a contract. But a statute which merely effects a change in civil procedure may have a valid retrospective application.'' (*Rosefield Packing Co.* v. *Superior Court,* 4 Cal.2d 120, 122 [47 P.2d 716].) ''It is a well-settled rule of law that the legislature may change rules of procedure, or remedies, and that such changes may be made applicable to pending actions, provided, of course, that under the guise of a mere change of procedure or substitution of remedies vested rights are not destroyed or the obligation of contracts impaired (*Buck* v. *Canty,* 162 Cal. 226 [121 P. 924]; *Aikins* v. *Kingsbury,* 170 Cal. 674 [151 P. 145]; *Bassford* v. *Earl,* 172 Cal. 653 [158 P. 124]), and so long as a reasonably efficient remedy remains (*Kerckhoff-Cuzner Mill & Lumber Co.* v. *Olmstead,* 85 Cal. 80 [24 P. 648]; *Lantz.* v. *Fishburn,* 17 Cal.App. 583 [120 P. 1068]). As said by Judge Cooley in his work on Constitutional Limitations, 'the bringing of suit vests in a party no right to a particular decision.' (Cooley's Constitutional Limitations, 8th ed., p. 789.) When a law only affects the remedy or procedure, 'all rights of action will be enforceable under the new procedure, without regard to whether they accrued before or after such change in the law and without regard to whether the suit had been instituted or not, unless there is a saving clause as to existing litigation.' (*People ex rel. Foote* v. *Clark,* 283 Ill. 221 [119 N.E. 329].)'' (*City of Los Angeles.*v. *Oliver,* 102 Cal.App. 299, 315-316 [283 P. 298]; see, also, *San Bernardino County* v. *Industrial Acc. Com.,* 217 Cal. 618 [20 P.2d 673].)

Up to this point the subject of damages has been considered solely from the standpoint of the admissibility of the evidence. Appellants also contend that from this evidence ''there is no legal evidence or proof of $4,500 or any other sum.'' As noted heretofore there is proof legally sufficient to sustain a judgment for $4,403.79 but respondent has failed to call our attention to items warranting a judgment for $4,500.

In an action for a breach of contract, the fact that the amount of damage may not be susceptible of exact proof does not bar recovery. (*Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal.2d 158 [88 P.2d 698, 89 P.2d 386].) The same rule applies in an action to establish a trust and for damages for breach of a contract of joint adventure. (*Elsbach* v. *Mulligan*, 58 Cal.App.2d 354 [136 P.2d 651].) Likewise, this rule applies in an action for conversion, so that the failure to ascertain damages accurately does not relieve a party at fault if the amount fixed is less than what the evidence shows. Under such circumstances the judgment may be permitted to stand. (*Paine* v. *Bank of Ceres*, 59 Cal.App.2d 242 [138 P.2d 396].)

In the present case, however, it is not future damages or even approximate damages that are to be ascertained, but a definite sum limited to the amount secured by the lien, plus compensation for loss of time and expenses incurred in pursuit of the property. (Civ. Code, § 3338.) The judgment should be reduced to the sum of $4,403.79. The trial court is directed to change the findings and conclusions of law to conform to the lesser amount. As so modified, the judgment is affirmed, each side to pay its respective costs on appeal.

Peters, P. J., and Knight, J., concurred.